# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | : | |
|---|---|---|
| | : | |
| v. | : | CRIM. NO. 07-288 |
| | : | |
| <u>AARON TAYLOR</u> | : | |

**Diamond, J.**                                                                                                                       **June 7, 2011**

## MEMORANDUM

On December 3, 2010, a jury convicted Defendant Aaron Taylor of assault with a dangerous weapon. *(Doc. No. 188.)* During trial, I stated that I would issue this Memorandum to explain more fully my rulings regarding courtroom security and Defendant's proffered justification defense. In addition, on December 16, 2010, Defendant timely filed a Motion for Judgment of Acquittal and/or for a New Trial. *(Doc. No. 205.)* Although I granted Defendant's request to supplement his Motion *(Doc. No. 207)*, after reviewing the record he has decided not to do so. For the reasons that follow, I will deny Defendant's Motion.

### BACKGROUND

The grand jury charged Defendant with assault with a dangerous weapon and assault resulting in serious bodily injury. 18 U.S.C. §§ 113(a)(3), (6); *(Doc. No. 1.)* On August 6, 2007, Defendant asked me to discharge his counsel—the Public Defender—alleging that she "ha[d] no defense strategy," did not adequately investigate his case, and did not respond to his requests. *(Doc. No. 11.)* After holding a hearing at which the Assistant Defender indicated that she could no longer effectively represent Defendant, I appointed new counsel. *(Doc. No. 50.)*

Shortly before trial, I granted the Government's Motion to Dismiss Count 2 (assault resulting in serious bodily injury). *(Doc. No. 178.)* Defendant's trial began on November 30, 2010 and concluded on December 3, 2010 with the jury convicting Defendant on the remaining charge—assault with a dangerous weapon. *(Doc. No. 189; Trial Tr. 39:6-10, Dec. 3, 2010.)*

The trial evidence showed that in the Fall of 2006, Defendant—having been convicted in this Court of drug and weapons charges—was incarcerated at the Philadelphia Federal Detention Center. *(Trial Tr. 13:17-14:9, Dec. 2, 2010.)* Because of Defendant's prior prison assaults and disciplinary violations, he was assigned to the Special Housing Unit, a ward separated from the rest of the prison population. According to Defendant, in early October, 2006, a guard mistakenly gave him an extra razor blade for shaving. Defendant fashioned a makeshift knife or "shank" with the extra blade, and took the weapon with him to recreation on October 12, 2006. *(Trial Tr. 49:3-21, 83, Dec. 2, 2010; see also Trial Tr. 75:20-24, Dec. 1, 2010.)*

SHU inmates are permitted a daily hour of recreation five days a week. *(Trial Tr. 63:5-6, Dec. 1, 2010.)* Before each session, the assigned officer asks each inmate if he wishes to take or decline recreation. *(Id. at 64:20-65:8.)* Two guards then transport each handcuffed inmate wishing to take recreation to one of five enclosed yards. *(Id. at 66:16, 77:18-78:10, 82:4-6, 116:17-20.)* As an inmate enters the yard, he backs up to a door slot or "wicket," and places his cuffed hands into the slot so that the guards on the other side of the locked door can uncuff him. *(Id. at 24:18-20; 62:21-25.)* At the end of the hour, the guards summon each inmate, who again backs up to the wicket so that the guards can again cuff his hands behind his back. *(Id. at 63:8-19.)* Once all the inmates are handcuffed, the guards unlock the yard door and escort the inmates

2

back to their cells.  *(Id.)*  If an inmate changes his mind and declines recreation once he arrives at the yard or anytime after he enters it, the guards will return him to his cell.  *(Id. at 93:3-94:7.)*

On October 12, 2006, Defendant elected to take recreation.  The recreation session was recorded by prison security cameras.  *(Trial Tr. 21:11-22:21, Dec. 1, 2010.)*  Defendant, Peter Bistrian, and several other prisoners were placed together in a fifteen-by-fifteen foot yard.  *(Trial Tr. 55:13-21, Dec. 2, 2010.)*  The guards removed Defendant's handcuffs before they removed Bistrian's.  *(Id. at 55:16-17.)*  Both Bistrian and Defendant spent virtually the entire recreation hour pacing; Bistrian also talked with other inmates.  *(Id. at 56-60.)*

At the hour's end, Bistrian backed up to the locked yard door, putting his hands behind him and through the slot to be cuffed.  *(Trial Tr. 62:10-11, Dec. 2, 2010.)*  Defendant followed Bistrian to the door.  *(Id. at 86:12-16.)*  As soon as Bistrian was handcuffed, Defendant attacked him with the shank, slashing Bistrian's face, arms, and legs, causing him to bleed profusely.  *(Trial Tr. 68:13-23, 111:19-21, Dec. 1, 2010; 64:1-4, 86:1-22, Dec. 2, 2010.)*  Defendant ignored the guards' repeated commands to stop, and for two and a half minutes continued to slash Bistrian even as the guards doused Defendant with three cans of pepper spray.  *(Trial Tr. 68:25-69:2, 131:15-16, Dec. 1, 2010.)*

With his hands cuffed behind him, Bistrian fell to the ground on his back and tried to fend off Defendant by kicking at the shank as Defendant slashed him.  *(Trial Tr. 73:20-23, 111:19-21, Dec. 1, 2010.)*  Finally, the guards tossed a "flash bang" grenade through the yard bars.  *(Id. at 132.)*  The grenade produced a very loud explosion and a bright flash that momentarily stunned Defendant.  *(Id. at 74-75, 132-33.)*  This allowed the guards to enter the

3

yard and subdue Defendant, who told them that he "had to get Bistrian" before Bistrian got him. *(Trial Tr. 67:24-68:2, Dec. 2, 2010; 155:3-9, Dec. 1, 2010.)* Bistrian was immediately taken to the prison hospital, where he was treated for deep cuts to his face, arms, and legs. *(Trial Tr. 68, 75, 150, Dec. 1, 2010.)*

**DISCUSSION**

Among the issues I addressed at trial were Defendant's objection to the courtroom security measures I ordered, and my rulings with respect to Defendant's proffered justification defense and the elements of assault with a dangerous weapon. Defendant again challenges these rulings in his Motion for Judgment of Acquittal and/or for a New Trial. *(Doc. No. 205.)* I will address each issue in turn.

I.   <u>Courtroom Security Measures</u>

Before trial, the Marshals Service advised that in light of Defendant's violent history, and the violent histories of four proffered defense inmate-witnesses, I should enhance courtroom security. Defendant objected and asked for a hearing, which I held on November 30, 2010. *(Security Hr'g Tr. 14:8-10, Nov. 30, 2010.)* I considered documentary evidence, Defendant's proffer respecting the inmate-witnesses, and the testimony of Deputy U.S. Marshal Joseph Iannuzzi, who credibly addressed both the need for additional security measures and his Office's recommendations.

Since Defendant's April 2006 incarceration at the Detention Center, he has twice used makeshift weapons to slash prisoners, attempted another slashing, and spat twice on a prisoner—apparent attempts to transmit a disease. (*Id.* at 16:24-17:22.) In a pretrial offer of proof, Defendant explained his intention to call four especially violent inmates who had resided in the Special Housing Unit around the time of the Bistrian assault. (*See Hr'g on Gov't Motion in Limine Tr. pt. 2, at 6-9, Nov. 22, 2010.*) One of these inmates had threatened to kill a member of this Court and an Assistant United States Attorney. (*Id.* at 8:15-20.) Given Defendant's repeated attacks on other inmates, the presence of these four prisoners created additional security concerns. (*Security Hr'g Tr. 23:16-22, Nov. 30, 2010.*)

I accepted Mr. Iannuzzi's recommendations and implemented the following measures:

- Additional plainclothes Marshals were seated in the courtroom.
- Defendant remained in leg restraints while seated at counsel table. The Marshals taped the restraints so they were not audible, and placed curtains around each counsel table to keep from view the legs of everyone seated at the tables. I required everyone in the courtroom to remain seated as the jury entered and left the courtroom. Once the jury was seated, only counsel were permitted to stand in the jury's presence.
- The Marshals brought Defendant to the witness box outside the jury's presence and cuffed his leg to the witness chair so that the cuff was not visible to the jury. So that this would not seem unusual, I also required a Government witness to take the stand out of the jury's presence.

- Because the witness chair is not attached to the floor, Mr. Iannuzzi remained concerned. Accordingly, I accepted his recommendation to allow a plainclothes Deputy Marshal to stand in the recess over my right shoulder out of the jury's view. I allowed counsel to sit in the jury box and confirm my observation that the jury could not see the Deputy Marshal.

*(Hr'g on Gov't Motion in Limine Tr. pt. 1, at 2:1-7, 3:7-11, Nov. 22, 2010; Hr'g Tr. 5:19-8:2, Nov. 30, 2010; Trial Tr. 147:13-25, Dec. 1, 2010; Trial Tr. 6:1-7, 12:12-13:6, Dec. 2, 2010.)*

In opposing these measures, Defendant argued primarily that they were unwarranted because he had never acted violently in court; rather, he had directed his violence only against other inmates. *(Hr'g Tr. 7:1-8, Nov. 30, 2010; see also Doc. No. 180.)* Defendant also contended that the additional security measures were prejudicial. *(Hr'g on Gov't Motion in Limine Tr. pt. 1, at 4:25-5:1, Nov. 22, 2010.)*

It is precisely because Defendant had repeatedly attacked other inmates that Mr. Iannuzzi was concerned that the four proffered inmate-witnesses would create an increased security risk. *(Security Hr'g Tr. 23:16-22, Nov. 30, 2010.)*

Defendant did not explain how the increased security could possibly prejudice him. The additional plainclothes Deputy Marshals were not noticeable. See Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986) (the noticeable deployment of extra security personnel at trial is not inherently prejudicial). The jury was unaware of Defendant's leg restraints and movement restrictions. See Deck v. Missouri, 544 U.S. 622, 629 (2005) ("[T]he [Constitution] prohibit[s] the use of physical restraints *visible* to the jury absent a trial court determination, in the exercise

6

of its discretion, that they are justified by a state interest specific to a particular trial." (emphasis added)); United States v. Tagliamonte, 340 F. App'x 73, 80-81 (3d Cir. 2009) ("[T]he District Court . . . made specific factual findings justifying leg restraints. Even assuming, *arguendo*, that the application of leg irons was error, [Defendant] suffered no prejudice, as the restraints were concealed from the jury's view." (citation omitted)). Similarly, the jury could not see the Deputy Marshal who stood behind me. See United States v. Jackson, 549 F.2d 517, 527 (8th Cir. 1977) (where the "jury was carefully shielded from contact with or awareness of the security measures in effect during the course of the trial," the defendants were not deprived of the "physical indicia of innocence to which they were entitled").

In sum, the Marshals went to great pains to implement essential security enhancements that would not and did not prejudice Defendant. Accordingly, I overruled Defendant's objections to those enhancements.

II.  Defendant's Motion for a New Trial and/or for Acquittal

Defendant argues that I erred by (1) precluding him from presenting evidence of purported justification; (2) "requiring" him to testify before ruling on his proffered justification defense; (3) failing to instruct the jury on justification; and (4) failing to instruct the jury that the Government must prove the "absence of just cause and excuse" beyond a reasonable doubt. *(Doc. No. 205.)* Defendant also moves for judgment of acquittal, arguing that the Government did not prove the absence of just cause and excuse. *(Id.)*

7

A. Standards

After conviction, the trial court may vacate judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[M]otions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." United States v. Martinez, 69 F. App'x 513, 516 (3d Cir. 2003). The court may "'order a new trial only if it believes that there is a serious danger that a miscarriage of justice has occurred[,] that is, that an innocent person has been convicted.'" United States v. St. Vallier, 404 F. App'x 651, 662 (3d Cir. 2010) (quoting United States v. Silveus, 542 F.3d 993, 1004-05 (3d Cir. 2008)).

In evaluating a "post-verdict motion for judgment of acquittal, a district court must 'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" United States v. Smith, 294 F.3d 473, 476-77 (3d Cir. 2002) (quoting United States v. Wolfe, 245 F.3d 257, 262 (3d Cir. 2001)). The court must "draw all reasonable inferences in favor of the jury's verdict." Id. (internal quotation marks omitted).

B. The Proffered Justification Defense

After learning that Defendant intended to argue justification, the Government moved *in limine* to preclude the presentation of that defense. *(Doc. Nos. 172, 177.)* As I explain below, I denied the Government's Motion without prejudice.

To make out justification, a defendant must show that (1) he "was under an immediate, unlawful threat of death or serious bodily injury" to himself or others; (2) he had a well-

8

grounded, reasonable fear or belief that the threat would be carried out if he did not commit the offense; (3) his "criminal action was directly caused by the need to avoid the threatened harm," and he had "no reasonable, lawful opportunity to avoid the threatened harm without committing the offense"; and (4) he had not recklessly placed himself in a situation in which he would be forced to engage in criminal conduct. See Third Circuit Model Criminal Jury Instruction 8.04; see also United States v. Alston, 526 F.3d 91, 95 (3d Cir. 2008) (listing elements of justification).

"A judge may, and generally should, block the introduction of evidence supporting a proposed defense unless all of its elements can be established." United States v. Haynes, 143 F.3d 1089, 1090 (7th Cir. 1998); accord Alston, 526 F.3d at 94, 98 (district court properly barred the proffered justification defense where the defendant "ha[d] not presented evidence that he was under a present threat of death or bodily harm, that there was a direct causal relationship between the criminal act and the avoidance of the threatened harm, or that he had no reasonable legal alternative"); United States v. Howe, 289 F. App'x 74, 79 (6th Cir. 2008) (proffered duress defense was properly barred); United States v. Paul, 110 F.3d 869, 871 (2d Cir. 1997) ("If, after [a pretrial evidentiary] hearing, the court finds that the defendant's evidence is insufficient as a matter of law to establish the [proffered] defense, the court is under no duty to give the requested jury charge or to allow the defendant to present the evidence to the jury.").

On November 22, 2010, I held a hearing on the Government's Motion *in Limine*. *(See generally Hr'g on Gov't Motion in Limine Tr. pts. 1-2, Nov. 22, 2010; Doc. No. 172);* see also United States v. Nwene, 20 F. Supp. 2d 716, 722 (D.N.J. 1998) ("Without hearing defendant's

9

evidence on these points, it is not possible to find, as requested by the United States, that defendant's justification defense fails as a matter of law.").

With the Government's agreement, Defendant initially made an *ex parte* offer of proof on justification. *(See Hr'g on Gov't Motion in Limine Tr. pt. 1, at 9; pt. 2, at 2-4)*; see also Fed. R. Crim. P. 17(b); United States v. Gaddis, 891 F.2d 152, 154 (7th Cir. 1989) (per curiam) ("[I]ndigent defendants, in requesting the issuance of a subpoena . . . need reveal their defense theory only to an impartial court and not to their government adversary."). Defendant subsequently agreed, however, to make his offer of proof with the prosecutor present. *(Hr'g on Gov't Motion in Limine Tr. pt. 1, at 4:8-15.)* Defendant explained that he intended to make out justification both through his own trial testimony and that of other witnesses (including the victim Bistrian). *(Id. pt. 2, at 2-4, 6:22-25, 7:22-25.)* Other than Defendant, Bistrian was the only proffered defense witness who actually saw the October 12, 2006 incident.

The Government urged me to preclude the justification defense in its entirety, thus barring Defendant's proffered testimony. *(Id. pt. 2, at 17:15-19.)* I agreed with the Government that Defendant's offer of proof did not make out justification. *(Id. pt. 2., at 17:8-10; Hr'g Tr. 4:17-22, Nov. 24, 2010.)* I nonetheless denied the Government's Motion without prejudice, explaining that I would not outright prohibit or even limit Defendant's proffered trial testimony. *(Doc. No. 182; Hr'g Tr. 4:23-5:9, Nov. 24, 2010.)* Rather, over the Government's objection, I ruled that I would allow Defendant to testify to his version of events. *(Hr'g Tr. 4-6, Nov. 24, 2010.)* If that trial testimony, combined with any renewed offer of proof, failed to make out justification, I would bar Defendant from presenting additional justification evidence and would

not instruct the jury on justification. *(Hr'g Tr. 6, Nov. 24, 2010.)* I also ruled that I would allow the defense to call the victim Bistrian regardless of whether Defendant testified at trial. *(Trial Tr. 4-5, Dec. 2, 2010.)* Although Defendant testified, he elected not to call Bistrian. *(Id. at 98.)*

In evaluating at trial whether Defendant made out justification, I considered Defendant's testimony and renewed offer of proof. Defendant sought to show that he slashed Bistrian—a purported member of the Aryan Brotherhood—because he believed Bistrian was about to attack him. Other than Bistrian, however, none of the proffered defense witnesses—SHU inmates and staff and a prison culture expert—actually saw the attack. Rather, their proffered testimony related only to a purported September 21, 2006 incident between Defendant and an FDC psychologist that gave rise to racial tensions, threats, and Defendant's resulting need to protect himself.

Accepting Defendant's testimony and proffer as true, and construing both in the light most favorable to him, Defendant sought to show that the following occurred on October 12, 2006: After mistakenly receiving an extra razor blade, Defendant failed to return it and instead fashioned it into a weapon. *(Trial Tr. 48-49, Dec. 2, 2010.)* On October 12th, Defendant elected to take recreation—even though he could have declined—and brought the shank with him. *(Id. at 83.)* The officers placed Defendant in the recreation yard first, followed by Bistrian. *(Id. at 55, 84.)* Although Defendant feared since the September 21st incident with the FDC psychologist that Bistrian was going to attack him, when Defendant saw Bistrian enter the yard, Defendant did not ask to be returned to his cell and so avoid any confrontation. *(Id. at 84-85.)* Rather, Defendant "went and got [his] cuffs off first, and then . . . walked to the back of the

11

[yard]." *(Id. at 56:10-15.)*

Defendant and Bistrian spent the recreation hour pacing, with Bistrian occasionally speaking to other inmates. *(Id. at 56-57, 75:6-11.)* Although Bistrian purportedly told Defendant that he "was going down," Bistrian made no threatening movement or gestures toward Defendant. *(Id. at 76.)*

At the end of the hour, Defendant closely followed Bistrian to the yard door and waited until Bistrian's hands were cuffed behind him before attacking Bistrian. *(Id. at 86.)* Defendant continued to slash Bistrian while Bistrian lay on his back with his hands cuffed behind him, kicking at the shank. *(Id. at 65-66, 86-89.)* Defendant disregarded the guards' repeated commands to stop. *(Id.)* On the contrary, Defendant continued the attack even though the guards doused him with three cans of pepper spray. *(Id. at 65-66; see also Trial Tr. 131, Dec. 1, 2010.)* Only after a stun grenade exploded in Defendant's face were the guards able to subdue him. *(Trial Tr. 74-75, Dec. 1, 2010.)*

This offer of proof does not make out any of the elements of justification. Defendant was not "under an immediate, unlawful threat of death or serious bodily injury" because Bistrian was handcuffed throughout Defendant's attack. 3d Cir. Model Jury Instr. No. 8.04.

Defendant did not have a "well-grounded," reasonable fear or belief that Bistrian's "threat would be carried out if [he] did not commit the offense." Id. Defendant testified that he reasonably believed Bistrian could slip out of his cuffs and use them as a weapon. Yet, when the recreation hour began—and Defendant and Bistrian were both handcuffed—Defendant evidently did not fear that Bistrian would slip loose of the cuffs and use them as a weapon.

12

Defendant's repeated slashing of Bistrian was not "directly caused by the need to avoid the threatened harm" because it was not in response to any threatening action by Bistrian. Id. Moreover, Defendant took no action to avoid the perceived threat even though he had numerous opportunities to do so. Although Defendant purportedly saw Bistrian slip out of his handcuffs at least three weeks before the October 12th attack, he never reported this incident to prison officials. *(Trial Tr. 37:11-15; 70-73, Dec. 2, 2010.)* Defendant testified that Bistrian began threatening and taunting him as early as September 21st, but never once alerted prison officials during their weekly rounds or reported the threats in his complaints to the Warden. *(Id. at 70-73.)* Instead, on October 12th, Defendant elected to take recreation and brought with him a deadly weapon. When he saw that he would be locked inside the recreation yard with Bistrian, Defendant did not ask to be removed from the yard and returned to his cell. Even crediting Defendant's offer of proof, by choosing to remain in the yard with Bistrian, Defendant "recklessly placed [himself] in a situation in which [he] would be forced to engage in criminal conduct." 3d Cir. Model Jury Instr. No. 8.04.

In these circumstances, Defendant was not entitled to present a justification defense. See United States v. Andrade-Rodriguez, 531 F.3d 721, 724 (8th Cir. 2008) (per curiam) ("Because the appellants' offers of proof did not even attempt to establish [one of the elements of justification] . . . we conclude that the district courts did not err by excluding the [expert's] testimony."); United States v. White, 75 F. App'x 894, 898 (3d Cir. 2003) ("[T]he District Court was correct in deciding that White's proffer failed to meet the legal standards of the justification

defense. The District Court properly declined to allow evidence of that defense to be submitted to the jury.").

The Third Circuit's decision in United States v. Reed is instructive. 173 F. App'x 184, 187 (3d Cir. 2006). During a high-speed car chase, police saw the passenger Reed drop a gun from the car window. 173 F. App'x at 185. Charged with possession of a firearm by a convicted felon, Reed testified at trial that he discarded the gun to "get it away from" the driver, Hughey, who was "yelling" that Reed "was going to make matters worse for [him]self." Id. at 186 (internal quotation marks omitted). The Third Circuit upheld the district court's refusal to charge the jury on justification:

> [Reed] presented no evidence of an altercation, nor did he present any evidence that would suggest that the driver had threatened to shoot anyone. Although it may have been perfectly rational for Reed to have been concerned about Hughey's conduct, he failed to meet the legal standard of a justification defense because he was not in imminent danger. . . . We realize that Reed testified that Hughey, the jitney driver, was yelling and refused to pull over. That conduct, however, even coupled with the presence of a firearm in the console, did not put Reed in a position that he reasonably feared "an immediate threat of death or serious bodily harm" to himself or even to the police.

Id. at 187 (internal quotation marks and citations omitted). Like Reed, Defendant attempted to establish justification by testifying that he was in a confined space with a person who purportedly had access to a "dangerous weapon." Like Reed, Defendant could not establish that he reasonably feared an imminent threat of death or serious bodily injury.

In these circumstances, Defendant was not entitled to present a justification defense to the jury.

C.     Defendant's Testimony

Defendant next contends that I impermissibly "required" him to testify before ruling on his justification proffer. This is simply incorrect. Although Defendant's proffer did not remotely make out justification, I was not prepared to rule that Defendant could not testify to his version of events or that he could not call Bistrian—the only proffered eyewitness to the attack. Rather, I denied the Government's Motion to Preclude the Justification Defense without prejudice, thus allowing Defendant to testify and call Bistrian if he chose to do so. The Government could then renew its Motion if the trial testimony (from Defendant, Bistrian, or both)—combined with any renewed offer of proof—failed to make out justification.

Although Defendant testified at trial, he chose not to call Bistrian. His renewed offer of proof was no more convincing than his pretrial offer. Accordingly, I did not allow Defendant to present additional justification evidence and did not charge the jury on justification. I did, however, allow defense counsel to argue in closing—over the Government's objection—that Defendant's testimony made out self-defense. *(Trial Tr. 138-151, Dec. 2, 2010; see also Trial Tr. 6-8, Dec. 3, 2010.)*

In these circumstances, I did not "require" Defendant to testify at trial. On the contrary, Defendant twice indicated before my preliminary justification ruling that he intended to testify at trial. *(See Hr'g on Gov't Motion in Limine Tr. pt. 2, 7:22-8:4, Nov. 22, 2010; Hr'g Tr. 4:6-10, Nov. 24, 2010.)* That I reserved my final ruling on justification until trial—thus allowing Defendant to testify if he wished—did not "require" Defendant's testimony. On the contrary, it was the proffered justification defense itself—that Defendant feared that Bistrian, although

15

handcuffed, would attack him—that "required" the testimony of the only person who could offer this evidence: Defendant himself. Cf. Menendez v. Terhune, 422 F.3d 1012, 1032 (9th Cir. 2005) ("Only the defendants could testify to whether they believed the peril was imminent."); United States v. Singh, 811 F.2d 758, 762 (2d Cir. 1987) ("[T]he court did not compel appellant to testify at all. It merely refused to accept the proffered testimony of other witnesses until a proper foundation was laid. There was nothing erroneous about this.").

Finally, once I deemed Defendant's pretrial justification proffer inadequate, the Government vigorously urged me to bar Defendant's testimony altogether, arguing that it would effectively allow Defendant to present a baseless and inadmissible justification defense. *(See generally Doc. No. 177.)* That I erred on the side of caution and allowed Defendant to tell the jury his version of the attack—and allowed his lawyer to make closing argument based on that testimony—hardly prejudiced Defendant. Cf. United States v. Palma-Ruedas, 121 F.3d 841, 858 (3d Cir. 1997) ("[E]ven if the statement was admissible, its [exclusion] did not constitute prejudicial error. The district court allowed the inference that the defense hoped to get across . . . . Further, as noted earlier, defense counsel was able to refer to the excluded statement in closing. Thus, because defense counsel was able to get the point across to the jury anyway, the district court's ruling, if error, was harmless."), *reversed on other grounds by* United States v. Rodriguez-Moreno, 526 U.S. 275, 282 (1999).

D.  Jury Charge

Defendant argues that I should have charged the jury on justification. Once again, because Defendant did not make out any of the elements of the defense, he was not entitled to a jury instruction on justification. See United States v. Reed, 173 F. App'x 184, 187 (3d Cir. 2006) ("[Defendant] failed to meet the legal standard of a justification defense because he was not in imminent danger. . . . Therefore, the district court properly refused to charge the jury on the defense of justification."); see also United States v. Villela-Alberto, 285 F. App'x 98, 101 (4th Cir. 2008) (per curiam) ("[T]he district court did not abuse its discretion in declining to give the requested self-defense instruction . . . . The jury heard testimony, which was corroborated by videotape evidence, that [the victim] was standing with his hands behind his back and did not make any threatening movement towards [Defendants] before they assaulted him.").

E.  Elements of the Offense

Finally, Defendant argues that I should have instructed the jury that the Government was obligated to prove beyond a reasonable doubt the "absence of just cause and excuse." *(Doc. No. 205.)* He also moves for a judgment of acquittal on this ground. *(Id.)*

Although § 113(a)(3) prohibits "[a]ssault with a dangerous weapon, with intent to do bodily harm, and *without just cause or excuse*," every Circuit to address the question has held that the absence of just cause or excuse is not an element of the crime. 18 U.S.C. § 113(a)(3) (emphasis added); see United States v. Guilbert, 692 F.2d 1340, 1343 (11th Cir. 1982) (per curiam) ("The existence of 'just cause or excuse' for the assault is an affirmative defense, and the

17

government does not have the burden of pleading or proving its absence."); accord United States v. Smith, 520 F.3d 1097, 1101 (9th Cir. 2008) ("18 U.S.C. § 113(a)(3) . . . has three elements: (1) that the defendant intentionally struck or wounded the victim; (2) that the defendant acted with the specific intent to do bodily harm; and (3) that the defendant used a 'dangerous weapon.'"); United States v. Estrada-Fernandez, 150 F.3d 491, 494 (5th Cir. 1998) (per curiam) ("In order to convict a defendant of assault with a dangerous weapon pursuant to 18 U.S.C. § 113(a)(3), the government must prove that the defendant (1) assaulted the victim; (2) with a dangerous weapon[; and] (3) with the intent to do bodily harm."); United States v. Duran, 127 F.3d 911, 915 (10th Cir. 1997) (same); see also KEVIN F. O'MALLEY ET AL., 2 FEDERAL JURY PRACTICE AND INSTRUCTIONS § 25:06 (6th ed.) (listing as the "essential elements" of 18 U.S.C. 113(a)(3) that Defendant (1) intentionally struck the victim; (2) used a dangerous weapon; (3) acted with intent to do bodily harm to the victim; and (4) intentionally struck the victim "within the special maritime and territorial jurisdiction of the United States"). The Eighth Circuit has issued contradictory rulings on the question. Compare United States v. Herron, 539 F.3d 881, 886 (8th Cir. 2008) (requiring the government to prove only that Defendant (1) assaulted the victim; (2) with a dangerous weapon; and (3) with intent to do bodily harm), with United States v. Bordeaux, 570 F.3d 1041, 1047 (8th Cir. 2009) (listing "acted without just cause or excuse" as an element of the offense).

      This wealth of authority convinced me that the absence of just cause or excuse is not an element of assault with a dangerous weapon. Accordingly, the Government was not required to prove that absence beyond a reasonable doubt, and I was not required to charge the jury that the

Government had such a burden.  See generally Guilbert, 692 F.2d at 1343; see also Ninth Circuit Model Criminal Jury Instruction 8.7, cmt. to 18 U.S.C. § 113(a)(3) ("[T]he existence of 'just cause or excuse' is an affirmative defense, and the government does not have the burden of pleading or proving its absence.").

Defendant thus is not entitled to judgment of acquittal or a new trial on the basis of my jury charge.

**CONCLUSION**

For these reasons, I conclude that Defendant received a fair trial.  I will, accordingly, deny his Motion for Judgment of Acquittal and/or for a New Trial.

An appropriate Order follows.

**BY THE COURT.**

/s/ Paul S. Diamond

_____
**Paul S. Diamond, J.**